HOLMES, Judge.
This is an appeal by the State of Alabama from a decree of the Circuit Court of Montgomery County. That court held certain proceeds paid to the taxpayer, Rockaway Corporation, were not subject to Alabama’s lease tax imposed by Tit. 51, § 629(21), et seq. The pertinent part of the statute levies a tax on proceeds “accruing from the leasing or rental of tangible personal property.”
The issue on appeal is whether the proceeds in question were paid to the taxpayer for the rental or lease of tangible personal property within the meaning of the statute.
The taxpayer contends that the proceeds paid to it are for personal services and, hence, not taxable. The State on appeal argues otherwise.
Tit. 51, § 629(22), Code of Alabama (1973 Cum. Pocket Part), in pertinent part provides:
“[Tjhere is hereby levied ... a privilege or license tax on each person engaging or continuing within this state in the business of leasing or renting tangible personal property at the rate of 4% of the gross proceeds derived by the lessor from the lease or rental of tangible personal property; . . .”
The term “gross proceeds” is defined as:
“. . the value proceeding or accruing from the leasing or rental of tangible personal property, without any deduction on account of the cost of the property so leased or rented, the cost of materials used, labor or service cost, interest paid or any other expense whatsoever, . . ” (Tit. 51, § 629(21)(d), Alabama Code (1973 Cum. Pocket Part))
Pursuant to the above statute, the State made a final assessment of taxes against the taxpayer-Rockaway. Taxpayer appealed this assessment to the Circuit Court of Montgomery County, where trial was had on May 13, 1976.
The evidence adduced at the trial is virtually undisputed and reveals the following:
Taxpayer-Rockaway, operating under various names, has been engaged in the development of wirebound boxes and wire-bound box machinery continuously since 1907. The primary machinery which it manufactures is utilized in producing wire-bound boxes. Taxpayer leases this machín- *446 ery to numerous manufacturers located both throughout the continental United States and in twelve foreign countries.
The T. R. Miller Mill Company, Inc., of Brewton, Alabama, is the only company with whom the taxpayer has business dealings in the State of Alabama.
On December 31, 1946, taxpayer and the Miller Company entered into a 25-year “Lease and License Agreement,” which was renewed through exercise of an option by the Miller Company in 1970. Taxpayer is referred to as “Lessor” in the agreement; the Miller Company is termed the “Lessee.” Pertinent portions of this agreement are as follows:
“Lessor is willing to lease box-making machines to Lessee and to license Lessee under said patents on the terms and under the conditions hereinafter set forth.
“1. . . . Lessor hereby gives to Lessee the right and license (a) to make on Lessor’s machines in the factory of Lessee at Brewton, Alabama boxes covered by any one or more of the patents listed in Exhibit A; (b) to use in said factory, for the manufacture of boxes, machines leased hereunder from Lessor; (c) to use in said factory, for the manufacture of boxes on Lessor’s machines, the method inventions covered by any one or more of said patents; and (d) to sell in the United States boxes made under this agreement.
“2. Subject to the terms and conditions herein contained, Lessor hereby leases to Lessee the machines of Lessor now or hereafter delivered to Lessee for use hereunder.
“Lessee hereby agrees to pay to Lessor for the initial right to possess all machines leased hereunder, delivered F.O.B. place of manufacture, a sum of money, to be specified by Lessor, not to exceed the reasonable cost of production of such machines, .
“Lessee agrees that it shall not have or assert any property right in any machine leased under this agreement, but shall have only the right to use the same under the conditions of this agreement.
“3. Lessee agrees to pay to Lessor, in addition to the amounts hereinbefore provided to be paid by Lessee for the initial right to possess the machines leased hereunder, (a) sums of money equal to four per cent (4%) of the gross sales or fair market value, whichever is higher, of all ‘Rock Fastener’, ‘All-Bound’, and ‘James’ boxes made under this agreement, and (b) sums of money equal to two per cent (2%) of the gross sales or fair market value, whichever is higher, of all other boxes made under this agreement; and Lessee agrees to pay such sums as a royalty for the use of any or all of the patented inventions hereunder licensed to be used and/or as a rental for the use of any or all machines leased hereunder; and Lessee agrees to pay such sums ... on or before the fifteenth day of each calendar month, . . . ” [Emphasis supplied.]
In accordance with paragraph 2 of the agreement, the Miller Company paid Rocka-way a $112,500 fee for the initial right to possess the machinery. The factory cost to Rockaway for the machinery it provided to the Miller Company was $176,225. Payments pursuant to clause 3 above for the “use of the patented inventions . and/or as a rental for the use of any or all machines leased” have totaled in excess of $3,000,000 over the years.
David G. Kingsley, a senior vice president for Rockaway, testified that the “patented inventions” referred to in the above quoted portion of paragraph 3 related to patents on boxes. On cross examination, he admitted that patents had expired for three of the boxes on which Rockaway was receiving a 4% “royalty” payment.
Kingsley also testified that in addition to providing the Miller Company with machinery, Rockaway provided numerous additional services to that company and all of Rock- *447 away’s lessees. There were no charges to the Miller Company or any other lessees, other than the two set forth above, for these additional services, which are extensive.
Rockaway develops and designs wire-bound boxes. The wirebound box industry differs from other manufacturing industries in that the boxes are not merely manufactured, placed on shelves, and sold. Rather, boxes usually must be integrated into an already existing user packaging procedure. Rockaway deals directly with these ultimate users, i. e., the customers who purchase boxes from Rockaway’s lessees, to determine their requirements for boxes. In this manner, Rockaway both creates a demand for its patented boxes, which are sold by its lessees, and also insures that its leased machinery possesses the capacity to produce boxes of the desired characteristics.
Taxpayer-Rockaway advertises and prints promotional brochures regarding the boxes for its lessees. Rockaway also operates two laboratories for testing the strength and durability of boxes. The taxpayer additionally conducts “market and box arrival inspections and servicing” whereby it maintains employees in major terminals to check the condition of its lessees’ boxes upon arrival at a receiver’s warehouse.
Taxpayer-Rockaway also provides the following services to its lessees without charge: training courses for box salesmen and plant mechanics: cost systems and cost reduction consultation; and machinery service assistance. Furthermore, Rockaway maintains engineer records regarding the equipment held by each lessee, so that it can respond to inquiries from the various lessee-manufacturers concerning the type boxes their machinery is capable of manufacturing.
Other services relating to the development of machinery and substitute box materials are also provided by Rockaway without cost.
Kingsley, the Rockaway vice president, further testified that Rockaway retained the same agreement with all of its lessees, the pertinent provisions of which have been set forth, supra.
John R. Miller, the president of the T. R. Miller Mill Company, Inc., testified that his company purchases machines and equipment from numerous other companies, none of which provided the type services rendered his company by Rockaway. He stated the Miller Company could not afford to pay the sum of money it did to Rockaway if the latter did not provide the above enumerated services.
Against this background, the trial court found that the lump sum payment of $112,-500, made by the Miller Company to taxpayer-Rockaway for the “initial right to possess” the machinery, was for the lease or rental of tangible personal property and therefore subject to the lease or rental tax imposed by Tit. 51, § 629(22), Code of Alabama.
The $3,000,000 in monthly payments from the Miller Company to Rockaway, the amount of which was determined by the lessee’s gross receipts derived from the sales of its boxes (pursuant to paragraph 3 of the agreement), were held to have been made for services rendered and therefore not subject to the lease or rental tax levied by Tit. 51, § 629(22). It is from this latter finding that the State has taken this appeal.
As previously noted, the State contends the decree of the trial court is clearly erroneous insofar as it fails to tax the variable monthly sums paid by the Miller Company to Rockaway pursuant to paragraph 3 of their agreement. The State argues that the only agreement between Rockaway and the Miller Company is that embodied in the written contract, the substance of which is a lease.
Taxpayer, on the other hand, contends in accordance with the findings of the trial court, that the variable payments, 4% or 2% of the gross sales made by the Miller Company, depending upon the type box involved, are actually for services rendered. Consequently, taxpayer concludes, since the payments are for services rendered, they *448 are not governed by Tit. 51, § 629(22), which only imposes taxes on gross receipts derived from leases or rentals. As shown below, this court is not in absolute agreement with either party.
In order for the variable monthly payments made by the Miller Company to taxpayer-Rockaway to be subject to the tax levied by Tit. 51, § 629(21), et seq., it is mandatory that they have been made for the lease or rental of business machines. To determine whether the payments were so made, it is necessary to ascertain the true nature of the agreement between the parties. Put another way, the intent of the parties to the agreement must be established. Substance must govern over form. Otherwise, evasion of the taxing statutes would be permitted by merely affixing a nontaxable label to an otherwise taxable transaction. Boswell v. Paramount Television Sales, Inc., 291 Ala. 490, 282 So.2d 892 (1973).
The nature of the agreement is determined by the intent of the parties. Wagar v. Marshburn, 241 Ala. 73, 1 So.2d 303 (1941). To ascertain the intention of the parties, regard must be had to the relationship of the parties at the time of the contract. G.F.A. Peanut Ass’n v. W. F. Covington Planter Co., 238 Ala. 562, 192 So. 502 (1939).
“And where the parties have reduced their agreement to writing, the writing, in the absence of fraud or mistake, is the sole expositor of the transaction and the agreement of the parties. A court cannot, under the guise of construction, provide a new and different contract for the parties. . . . ” (Canal Insurance Company v. Stidham, 281 Ala. 493, 497, 205 So.2d 516, 519 (1967))
Viewing the circumstances of this case with the above principles in mind, we must conclude that the trial court erred in construing the variable payments to have been made for services rendered.
The terminology of the agreement supports our conclusion. It is termed a “lease and license agreement.” Rockaway and the Miller Company are referred to throughout as “lessor” and “lessee,” respectively.
Rockaway is in the business of developing wirebound boxes and machinery to manufacture these boxes. The payments in clause 3 are unambiguous and plainly in keeping with Rockaway’s business of licensing box patents and rental of machinery for manufacturing these boxes. For reference sake, the pertinent portion of the clause in question is again set forth:
“3. Lessee agrees to pay to Lessor, in addition to the amounts hereinbefore provided to be paid by Lessee for the initial right to possess the machines leased hereunder, (a) sums of money equal to four per cent (4%) of the gross sales or fair market value, whichever is higher, of all ‘Rock Fastener’, ‘All-Bound’, and ‘James’ boxes made under this agreement, and (b) sums of money equal to two per cent (2%) of the gross sales or fair market value, whichever is higher, of all other boxes made under this agreement’ and Lessee agrees to pay such sums as a royalty for the use of any or all of the patented inventions hereunder licensed to be used and/or as a rental for the use of any or all machines leased hereunder; and Lessee agrees to pay such sums ... on or before the fifteenth day of each calendar month . . . ” [Emphasis supplied.]
Under 3(a) the lessee, the Miller Company in this case, is bound to pay Rockaway 4% of the proceeds it derives from the sale of certain named boxes: “ ‘Rock Fastener,’ ‘All-Bound,’ and ‘James’ ” boxes. It is imperative to note that at the time of the agreement between the parties, the patents to these boxes were held by Rockaway. We deem it immaterial that these patents have now expired, for the Miller Company is paying Rockaway for the benefit it derives from the sales of these patented boxes. Hence, it is apparent that the 4% portion of the payment is a “royalty,” as stated by clause 3 of the agreement.
The Miller Company is also obligated under 3(b) to make payments equalling 2% of *449 the gross sales or fair market value, whichever is higher, of all boxes, other than those specifically named above, which it produces.[1]
This 2% figure is computed in one of two methods. If the box produced is one to which Rockaway retains the patent, the 2% is a “royalty” payment for the Miller Company’s utilization of Rockaway’s patent. However, as Rockaway’s vice president testified, Rockaway also receives a 2% sum on all other boxes (those to which Rockaway does not possess the patents) which are produced on machinery leased to the Miller Company by Rockaway. Since Rockaway retains no rights in these latter boxes, payments of this second category cannot be deemed to constitute royalties paid by the Miller Company for the utilization of Rock-away’s patents. It is apparent that payments of this latter category are actually proceeds paid to Rockaway for usage of the machinery. Hence, these amounts are for the lease or rental of tangible personal property.
Such a construction of the agreement is supported by the following portion of paragraph 3:
“[A]nd Lessee agrees to pay such sums as a royalty for the use of any or all of the patented inventions hereunder licensed to be used and/or as a rental for any or all of the machines leased hereunder; . ” [Emphasis supplied.]
To the extent that the amount of the payment made by the Miller Company to Rock-away is based on the gross sales of boxes patented by Rockaway, the payments do constitute a “royalty.” If in any month the Miller Company also produces boxes to which Rockaway does not hold the patents, money thus paid constitutes a “rental for the use of any or all machines leased hereunder.” Thus, the rationale for the “and/or” portion of the agreement is clear. Conceivably, in any given month, the Miller Company might manufacture boxes both patented and not patented by Rockaway. In this case the “and” provision would become effective. However, if either no boxes to which Rockaway held the patent, or only boxes which it had patented were manufactured and sold by the Miller Company, the “or” provision of the clause would govern.
Similarly, other portions of the agreement reveal the trial court erred in finding the payments in question to have been made for services rendered. Nowhere in the agreement do the parties mention the alleged “services,” which Kingsley testified Rockaway provided to its lessees. It is difficult for this court to reconcile the apparent intent of the parties as conveyed by the express meaning of the written words in the agreement with that which the parties would have us believe exists. Put another way, we are hard pressed to believe that parties would draft an agreement under which in excess of $3,000,000 has been paid for “services” to be rendered and not only not mention the nature of these services but actually mislabel them as constituting “royalty” and “rental” payments.
Furthermore, although Rockaway does provide the services described supra, we cannot at this time state that it is contractually bound to do so. As has previously been stated, Rockaway’s business is twofold. It designs and leases machinery for the production of wirebound boxes which it also designs and patents. The majority of the services it supposedly provides to the Miller Company appear to this court to be inherent in conducting a business of this nature. In other words, as opposed to being in the business of providing services to licensees of patents and lessees of machinery, Rockaway is in the licensing and leasing business. The services it performs are incidental to this primary business. We would note that Rockaway does not contend the services it provides are solely for the *450 Miller Company. Rather, they benefit all those leasing Rockaway machinery and using Rockaway patents.
From what we have said above, it is apparent that the trial court erred in finding the payments made pursuant to paragraph 3 of the agreement to have been for services rendered. We hold the amount of the payments made pursuant to clause 3(a) (the 4% clause) of paragraph 3 to constitute royalty payments. Likewise, receipts obtained by Rockaway pursuant to clause 3(b) (the 2% clause) are royalties insofar as the amounts thereof are based on gross receipts from the sale or production of boxes to which Rockaway retains the patents. Neither of the preceding amounts are subject to the tax imposed by Tit. 51, § 629(21), et seq.
However, the amount of the payments made by the Miller Company to Rockaway pursuant to clause 3(b) of the agreement, for the production of boxes for which Rock-away does not possess the patents, is for the lease or rental of tangible personal property. This amount, therefore, is subject to the tax imposed by Tit. 51, § 629(21), et seq.
Taxpayer additionally contends that such taxation is prohibited because the effect thereof would be taxation by the State of Alabama upon services rendered by Rocka-way outside the State of Alabama. Taxpayer asserts such taxation is constitutionally impermissible because the statute fails to use an apportionment formula. This contention is without merit.
We have previously stated that the taxable portion of the payment is for the rental of tangible personal property. This property is located entirely within the State of Alabama. There is no requirement for apportionment of a tax which is levied solely on activities carried on within the state, absent a showing that such taxation places a burden on interstate commerce. International Harvester Co. v. Department of Treasury of State of Indiana, 322 U.S. 340, 64 S.Ct. 1019, 88 L.Ed. 1313, rehearing denied, 322 U.S. 772, 64 S.Ct. 1281, 88 L.Ed. 1597 (1944).
REVERSED AND REMANDED FOR ENTRY OF A JUDGMENT NOT INCONSISTENT WITH THIS OPINION.
WRIGHT, P. J., and BRADLEY, J., concur.

. Although not set forth in the above recital of specific contract provisions, the agreement between the parties contains a paragraph which enables the Miller Company to exercise an option and thereby procure production rights to boxes patented by Rockaway subsequent to the execution of the agreement. Payments to Rockaway for this right are governed by the 2% provision of paragraph 3(b).